**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 30, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

OBERMEYER HYDRO ACCESSORIES,
INC., d/b/a Obermeyer Hydro, Inc.,

     Plaintiff Counterclaim Defendant -
     Appellant,

v.                                                                   No. 16-1083

CSI CALENDERING, INC., d/b/a CSI
Calendering Specialists, Inc.,

     Defendant Counterclaimant-
     Appellee.
_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-00184-RM-KMT)**
_____

Daniel M. Gross, Woods & Aitken, LLP, Denver, Colorado; (Mark D. Changaris, Berg
Hill Greenleaf & Ruscitti, LLP, Boulder, Colorado, on the briefs), for Plaintiff
Counterclaim Defendant-Appellant.

Reid A. Page, Stinson Leonard Street, LLP, Greenwood Village, Colorado; (Ryan  M.
Sugden, Stinson Leonard Street, LLP, Greenwood Village, Colorado, on the brief), for
Defendant Counterclaimant-Appellee.
_____

Before **LUCERO**, **HARTZ**, and **McHUGH**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

This appeal concerns a contract dispute. The parties agree that they had a contract but differ on the price. At the core of the dispute is a price quote dated January 11, 2013 (the January quote) from CSI Calendering (CSI) to Obermeyer Hydro Accessories, Inc. (Obermeyer). The quote seems straightforward enough:

We are pleased to quote...

| QUANTITY | | DESCRIPTION | PRICE | UNIT | TOTAL |
|---|---|---|---|---|---|
| | | CSI Part # 1042571C | | | |
| | | Compound 2530 NR/SBR | | | |
| | | Tire Cord 1000/4/3 Polyester | | | |
| | | OAG - .0625 | | | |
| | | Width - .58" | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | 1000/4/3 Polyester Tire Cord Only | $ 3.74 | LB | |
| | | Calendering, Compound & Poly Only | $ 2.23 | LB | |
| | | Turnkey Fabric, Compound & Calendering | $ 5.97 | LB | |

**Batch quantities will be built out.

Aplt. App. at 183. There is no dispute that the "Polyester Tire Cord Only" line refers to fabric sheets purchased by Obermeyer from CSI and that the "Calendering, Compound & Poly Only" line refers to a process called calendering by which rubber is compressed into the fabric sheets.

But the parties read the document quite differently. CSI claims that the quote unambiguously states that the combined price is $5.97 for each pound of calendered fabric. Obermeyer, on the other hand, views the quote as reflecting prices that the parties had previously agreed to when CSI prepared separate quotes for the fabric sheets and for the calendering of those sheets: $3.74 per pound of untreated fabric and $2.23 per pound of calendered product. Although it may appear that there is no difference whatsoever, the price CSI seeks is almost a 50% increase above what Obermeyer had been paying.

2

The increase is a consequence of the fact that calendering doubles the weight of the fabric. To obtain one pound of calendered fabric under the previous pricing, Obermeyer would purchase one-half pound of fabric sheet (for $1.87) and pay $2.23 for that half pound to be calendered into one pound of calendered fabric. That came to $4.10 per pound of calendered fabric. Under CSI's interpretation of the January quote, however, Obermeyer would pay $5.97 for the same product. The essence of the parties' dispute is whether the $3.74/lb price of the fabric sheets is based on the weight of the untreated sheets (the untreated pricing) or the weight of the calendered product (the treated pricing).

The district court granted summary judgment to CSI. On appeal the parties raise a number of arguments about whose view of the price should prevail. They disagree about whether they already had agreed on the price before issuance of the January quote, whether the January quote modified any prior agreement, and whether Obermeyer is bound by CSI's view of the pricing because Obermeyer paid a number of invoices over several months that reflected that view. In our view, there are unresolved factual disputes that preclude judgment for either party at this time. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings. We begin with a detailed discussion of the relationship between CSI and Obermeyer before and after the January quote because the parties' arguments rely so much on that relationship.

## I.    BACKGROUND

Obermeyer is a Colorado-based, family-owned business that designs and manufactures inflatable dams and other water-control structures. It purchased fabric

3

sheets from CSI, a Texas-based company, and frequently paid CSI to compress, or calender, rubber into the sheets. At the time of the dispute Obermeyer was managed by three people. Its president, Henry Obermeyer, was responsible for product development and overall management. Vice President Rob Eckman was responsible for sales, marketing, engineering, and project management. And Katherine Obermeyer, Mr. Obermeyer's wife, handled administrative matters that included accounts payable and receivable, payroll, and rubber purchasing.

CSI obtained its fabric from a Chinese supplier. Before the January quote it would send Obermeyer an invoice for the fabric 90 days after the fabric arrived in CSI's warehouse in Arlington, Texas, or when it was removed from the warehouse for calendering, whichever was sooner. CSI billed Obermeyer separately for the fabric at its untreated weight, and for the calendering at the increased weight of the finished fabric. Although Obermeyer was expected to pay CSI within 30 days after invoicing, its payments were typically late because of delayed payments from its customers—usually 20 to 50 days late, but occasionally as much as 60 to 91 days late. From 2010 to 2012, eight fabric and 13 calendering purchase orders were handled this way.

In October 2012, CSI sent Obermeyer a quote for uncalendered fabric at $3.74/lb. The cover e-mail touted, "We are pleased to inform you that [the] below quotes are $0.14/lb lower than our last purchase." Aplt. App. at 359. The quote was valid until the year's end. As always in the past, the quote used untreated pricing (that is, used the weight of the fabric before calendering) rather than treated pricing (using the weight after calendering). Mr. Obermeyer asked if CSI would be willing to delay invoicing

4

Obermeyer for the fabric until CSI had calendered it so that the fabric and calendering would be billed at the same time. CSI responded by reiterating its standing practice.

Beginning in November the communications between Obermeyer and CSI were shaped by Obermeyer's efforts to obtain a contract for a project involving four dams in Guiyang, China (the China project). In early November, Mr. Obermeyer notified CSI of a "prospective project, requiring expedited delivery" of some 100,000 linear yards of "fabric and associated rubber." *Id.* at 369. (A linear yard of untreated fabric weighed about 2.73 pounds.) On November 28, Mr. Obermeyer stressed in an e-mail that the "prospective order from China depends on our commitment to the earliest possible delivery," requiring as much as 176,000 pounds of fabric to be delivered in weekly batches beginning in January 2013. *Id.* at 365. The next day, CSI sent Mr. Obermeyer a proposed delivery schedule for the initial months of the China project. CSI already had some fabric in its Texas warehouse and additional fabric would be shipped from China to CSI in 20,000 pound increments from mid-December through January. CSI would send calendered product to Obermeyer from mid-December through January. Because CSI would need to calender the fabric shortly after it arrived from its supplier, it would not be warehoused. A few hours after receiving CSI's proposed schedule, Mr. Obermeyer sent an e-mail ordering fabric to be sent from China in December and added: "We will speak again in two weeks regarding the next shipment that would be required to meet our China Project schedule. Presumably we will have the contract with our client signed by then." *Id*. at 387. It appears that a purchase order was not attached to the e-mail.

5

Four days later, on December 3, CSI sent Mr. Obermeyer an e-mail beginning, "Attached is the updated pricing for [calendering]." *Id.* at 179. The attached quote, good for 30 days, set the calendering price at $2.23/lb, a 34% increase over the prior price of $1.66/lb. On December 6, Mrs. Obermeyer sent CSI a purchase order for the untreated fabric that Mr. Obermeyer had ordered on November 29. The price field was left blank.

On December 26, Mr. Obermeyer informed CSI that "[w]e just received notice that our customer has signed their contract with the project owner," and "[w]e expect to have our contract signed within a few days." *Id*. at 396. He then reported on January 3 that "[w]e believe we have reached agreement with our customer on all contract terms" and that "[o]nly the final signed contract remains outstanding." *Id*. at 395. CSI responded that it had asked its supplier "to hold on to our locked-in prices." *Id*. On January 8, 2013, Mrs. Obermeyer e-mailed a new purchase order for 100,000 pounds of fabric for the China project. The price field was again left blank, though a CSI employee responded the same day: "I am not clear why the unit price has not been mentioned, the unit price is [$]3.74/lb." *Id.* at 402. This was the price that CSI had quoted in October as valid through December. The next day, CSI sent Mr. Obermeyer a delivery schedule and stated that it had told its supplier "to proceed with production of [fabric] unless we ask them to stop within [the] next 2 days." *Id*. at 409.

CSI representatives met with Mr. Obermeyer and Mr. Eckman for about 20 minutes on the morning of January 10. CSI relies on this meeting to support its large price increase. The parties discussed Obermeyer's prior request that CSI send a single invoice for the fabric and calendering upon completion of calendering, and CSI agreed.

6

Although CSI contends that this change in invoicing was the reason for the price increase, there is no evidence that the parties discussed any price increase or a need for a change from untreated pricing to treated pricing as a result of the change in invoicing.

Also on January 10, Obermeyer gave CSI three purchase orders for the China project: a 60,000-pound fabric order at $3.74/lb, a 100,000-pound fabric order at $3.74/lb, and a calendering order for 178,500 pounds with the price left blank. It claims that the orders were given at the meeting; CSI claims they were given after. The district court's Order states that they were delivered on the same day as the meeting, but does not give a time.

Later that day, CSI and Obermeyer confirmed the 100,000-pound fabric order via e-mail, and Mr. Obermeyer placed an additional 40,000-pound order of fabric for other projects at $3.74/lb, to be billed when calendered. CSI acknowledged that it "underst[oo]d that this project is a go and we should release all [purchase orders] for the production to be shipped." *Id*. at 407, 548. Mr. Obermeyer replied, "The project is a go." *Id*. at 407.

On January 11, CSI e-mailed Mr. Obermeyer and Mr. Eckman the quote copied at the beginning of this opinion. The quote was for material to be used in the China project, and, as CSI must have known, Obermeyer had almost certainly already bound itself to what it would charge its customer because the terms for the China contract had been settled. Yet even though CSI insists that this quote increased the price Obermeyer would pay by about 46% (by doubling the price of untreated fabric), neither the e-mail nor the quote document alerted Obermeyer to any increase in price by changing from untreated

7

pricing to treated pricing for the fabric, or explained why such a huge increase was necessary. The word *turnkey* in the quote had never been used by the parties in their previous exchanges and was not defined in the e-mail or quote. (The parties disagree on whether it was a term used in the industry for a particular type of billing.) Mr. Obermeyer testified that he reviewed the quote but did not perceive any price change because CSI and Obermeyer had not discussed a price increase and "[i]t looked like it was restating our -- the prices on the [purchase order] for fabric. It looked like it was restating the quoted calendering price." *Id.* at 474. (As noted at the outset of this opinion, the lines for fabric and for calendering stated the same prices per pound as before.) Mr. Obermeyer forwarded the quote to Mr. Eckman, asking him to review it "to make sure this matches our numbers and that the quoted price is in line with the historical billings," *id*. at 162, but there is no record that Mr. Eckman replied to the e-mail.

From January to June 2013, CSI delivered to Obermeyer 21 shipments of calendered fabric totaling 402,365 pounds. About the same time that it shipped the calendered fabric, it would send Obermeyer an invoice. Although the invoices reflected CSI's understanding of the January quote, Obermeyer made 21 payments from February to October totaling roughly $2 million for the shipments. During this time, Mrs. Obermeyer "did not do any analysis" of the January quote's pricing, other than to note that "here's their line item for our price, here's another line item for the price, and here's the sum of what was above." *Id.* at 319. In July, Mrs. Obermeyer issued a new purchase order with one line for 20,000 pounds of fabric at $3.74/lb, totaling $74,800, and another line for 20,000 pounds of calendering at $2.23/lb, totaling $44,600, without

8

any mention of *turnkey* or a total price per pound for fabric and calendering. Although it is not clear whether this order was ultimately filed, a CSI representative testified that he would have likely processed the purchase order at the higher treated pricing.

In late October or early November 2013, Mrs. Obermeyer compared the project costs to the project budget and determined that Obermeyer had been charged much more than it had budgeted. Obermeyer notified CSI in November of its objection to overbilling, and it later refused to pay its outstanding debt. In January 2014, Obermeyer filed suit in the United States District Court for the District of Colorado for breach of contract, promissory estoppel, money had and received, unjust enrichment, and violation of the Texas Deceptive Trade Practices Act. CSI counterclaimed for breach of contract and unjust enrichment. CSI moved for summary judgment, and Obermeyer moved for partial summary judgment on liability for its breach-of-contract claim. The district court denied Obermeyer's motion and granted summary judgment for CSI.

## II.    DISCUSSION

"We review the district court's grant of summary judgment de novo." *Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1160 (10th Cir. 2014). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. West Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (brackets and internal quotation marks omitted). We view the evidence, and draw

9

all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *See Higby Crane Serv.*, 751 F.3d at 1160.  Because the parties agree that Texas law governs the agreement, we apply Texas law.  *See Carolina Cas. Ins. Co. v. Nanodetex Corp.*, 733 F.3d 1018, 1022 (10th Cir. 2013) (adopting the parties' shared view of what law governs).

Although CSI and Obermeyer agree that they had a contract, they do not agree on when it was formed.  Obermeyer contends that the contract was entered into before the January quote and was not subsequently modified.  CSI contends that the contract was not formed until the January quote and that even if the parties had a prior contract, the contract was modified (1) by the quote or (2) by Obermeyer's making numerous payments on invoices using the treated pricing.  We hold that there was sufficient evidence for a jury to find that the parties had reached a contract before the January quote and that there are disputed issues of fact precluding summary judgment for either party on whether the contract was modified by the quote or by Obermeyer's later payments.

### A.  Was there a contract before January 11?

Obermeyer contends that the parties had already formed a contract at the lower rate of $3.74/lb for untreated fabric and $2.23/lb for calendering before the January 11 quote.  "Under Texas law, the elements needed to form a valid and binding contract are (1) an offer; (2) acceptance in strict compliance with the offer's terms; (3) a meeting of the minds; (4) consent by both parties; (5) execution and delivery; and (6) consideration." *Specialty Select Care Ctr. of San Antonio, L.L.C. v. Owen*, 499 S.W.3d 37, 43 (Tex. App. 2016) (brackets and internal quotation marks omitted); *see also Coleman v. Reich*, 417

10

S.W.3d 488, 491 (Tex. App. 2013). In determining whether there was a meeting of the minds, Texas employs an "objective standard of what the parties said and did." *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App. 1999). Obermeyer claims that CSI's October quote for fabric at $3.74/lb and its December quote for calendering at $2.23/lb were offers that it accepted through its December 6 and January 8 purchase orders for untreated fabric and its January 10 purchase orders for fabric and calendering. Although the January 10 purchase order for calendering did not include a price term, the parties do not dispute that calendering was to be charged at the rate set forth in CSI's December quote—$2.23 per pound of *calendered* fabric (the treated price).

In challenging the proposition that the parties had agreed on pricing by January 10, CSI argues only that until the January 10 meeting the parties had not agreed on joint invoicing for fabric and calendering and that the earlier quotes were for fabric-only and calendering-only sales. But there is no evidence that CSI had ever suggested before January 11 that the timing of invoices would affect the price. A jury could reasonably find that a contract price of $3.74/lb for untreated fabric and $2.23/lb for calendering had been offered and accepted before the January 11 quote.

### B. January Quote

Even assuming that the parties had formed a contract at the untreated price by January 10, CSI argues that it is entitled to summary judgment because the parties later modified the pricing to the treated rate through the January quote. Like contract formation, modification requires mutual consent, which is ordinarily a question of fact for the jury. *See Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.

11

2008) ("Whether a contract is modified depends on the parties' intentions and is a question of fact."). "The burden of proving that a contract has been modified is on the party asserting modification," who "must prove that the other party had notice of the change and that the change was accepted." *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 581 (Tex. App. 1998). "[T]he other party [must have] had knowledge of the nature of the change." *Id*.

CSI argues that the invoices are clear in stating that the price is $5.97 per pound of calendered fabric and that this change in pricing was signaled by the use of the term *turnkey* on the January quote. But we think that the clarity of the quote is a question for the jury to decide. There are a number of reasons why Obermeyer could have thought that the quote reflected the prior practice of charging $3.74/lb for untreated fabric and $2.23/lb for calendering.

First, the quote shows the $5.97 price as the sum of the previously used prices of $3.74 and $2.23. It would be natural to assume that this indicated consistency, rather than a massive change in pricing.

Second, CSI did not state explicitly that it was changing the price or that it needed to increase the price if it was going to agree to single invoicing. On prior occasions CSI had notified Obermeyer of price changes—when it "updated" the calendering price on December 3, 2012, Aplt. App. at 179–80, and, unsurprisingly, when it reduced the price of fabric in October 2012. Such evidence of course of dealing is a well-recognized tool of contract interpretation under the Uniform Commercial Code (UCC). *See* Tex. Bus. & Com. Code § 1.303(d). And there would be no reason for Obermeyer to think that a price

12

increase would be needed as a result of single invoicing. To be sure, the new single-invoice arrangement meant that Obermeyer would not have to pay for the fabric until it had been calendered, whereas the earlier arrangement was that Obermeyer would have to pay for fabric no later than 90 days after it had been warehoused. But the 90-day limit had not been strictly enforced in the past. And in any event this change was highly unlikely to affect orders for the China project, because CSI was to calender the fabric immediately after receiving it from its supplier, so all scheduled fabric orders would be invoiced (jointly with calendering) well within 90 days of CSI's receipt of the fabric from its supplier.

Third, CSI never explained to Obermeyer how it was using the term *turnkey* and the term had never before been used in their dealings. Mr. Obermeyer swore that he had never encountered the term in his calendered-fabric transactions.

Fourth, Obermeyer had informed CSI on January 3 that it thought it had "reached agreement with [its] customer on all contract terms [and] [o]nly the final signed contract remains outstanding." Aplt. App. at 395. CSI responded that it had asked its fabric supplier "to hold on to our locked-in prices," *id*., presumably so that CSI could hold its price to Obermeyer steady. Obermeyer could assume that no honest business would suddenly change prices on a customer that had relied on its quotes to submit a bid so significant to its business. Indeed, Texas law requires that the modification of a contract for the sale of goods must be made in objective and subjective good faith. *See Man Indus. (India), Ltd. v. Midcontinent Exp. Pipeline, LLC*, 407 S.W.3d 342, 363–64 (Tex. App. 2013). "To establish objective good faith, the party asserting the modification must

13

demonstrate that the decision to seek modification was the result of a factor, such as increased costs, that would cause an ordinary merchant to seek a modification of the contract." *Id*. at 366. CSI claims that it charged the higher price "in response to a commercial exigency"—the invoicing of fabric and calendering together—and that it faced additional risk from delayed payment for the fabric. Aplee. Br. at 51. As previously noted, however, this concern is questionable. There is no evidence that CSI ever explained the concern to Obermeyer, which would have given Obermeyer a chance to stick with the prior invoicing practice at a much lower price. And even if some price increase was justified, it beggars belief that CSI calculated its increased risk to be exactly the amount of the higher price achieved by adding together the two earlier prices (for fabric and calendering) and applying them to the increased weight. The specifics of the purported change smack of fast dealing. On this record a jury could reasonably reject CSI's explanation.

### C. Payment of Invoices

CSI's best argument is that Obermeyer accepted the treated pricing by paying it over the course of nine months. Regardless of what happened up to and including the January quote, argues CSI, the invoices sent to Obermeyer from then on reflected a price of $5.97 per pound of calendered product and Obermeyer made 21 payments on those invoices between February and October 2013. CSI contends that these payments established a course of performance regarding the contract, which is entitled to significant weight in interpreting the meaning of a contract. *See* Tex. Bus. & Com. Code § 1.303(d) (course of performance "may give particular meaning to specific terms of the

14

agreement, and may supplement or qualify the terms of the agreement"); *id*. § 1.303(e)(2)

("[C]ourse of performance prevails over course of dealing and usage of trade.").  Under

the UCC:

> A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:
> (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
> (2) the other party, *with knowledge of the nature of the performance* and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

*Id.* § 1.303(a) (emphasis added).  We assume that the repeated "performance" that CSI

relies on is its submission of invoices setting forth its treated pricing.  What is lacking,

however, is conclusive evidence that Obermeyer had "knowledge" that the invoices

reflected treated pricing.  Here there is substantial evidence that Obermeyer, relying on

the good faith of CSI, acted without realizing that the price had been substantially

increased.  Even as late as July, when the now-contested invoices were still being paid,

Mrs. Obermeyer sent an additional purchase order for fabric and calendering at the

original rates of $3.74/lb and $2.23/lb.  Mrs. Obermeyer testified that she discovered the

price increase only after noting that the cost of calendered product for the China project

had substantially exceeded the budgeted amount.

CSI argues that Obermeyer should have known about the new pricing and should

be held responsible at that price.  This is hardly a frivolous argument.  Payment at a

higher price can be convincing evidence that the customer agreed to the price.  And there

may be a reliance interest of the seller who infers from payment that there is agreement

on the new price.  Texas law supports such a should-have-known test.  *See Preston Farm*

15

*& Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 298 (Tex. 1981). But we think that what Obermeyer "should have known" is a question for the jury. We have already recited several reasons why Obermeyer would have interpreted the January quote as leaving the price unchanged. The question is whether Obermeyer should have realized sooner that the invoices did not reflect its understanding of the pricing. Should Obermeyer have trusted CSI not to be sneaking a huge price increase past it and postponed any audit of their dealings, or should it have carefully studied each invoice as a precaution? In our view, reasonable people could differ in that assessment.

Finally, CSI argues that the contract should be interpreted according to CSI's intended meaning under what it terms the doctrine of negligent assent set forth in Restatement (Second) of Contracts § 20(2), which provides: "The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if . . . (b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party." CSI contends that its intended meaning of the invoices should prevail because Obermeyer had reason to know that it was being charged under treated pricing. But whether Obermeyer had "reason to know" is, as far as the parties have informed us, essentially the same question as whether it "should have known" what CSI meant by its pricing. Again, this is a jury question. Reasonable people can disagree on whether Obermeyer was

negligent in not detecting the pricing change sooner. Summary judgment would not be appropriate on the ground of negligent assent.[1]

CSI cautions that a decision against it would "inject untenable uncertainty into commercial transactions" by "encourag[ing] contracting parties to remain ignorant of the prices they pay." Aplee. Br. at 40. We disagree. There is a strong policy interest in encouraging trust between parties to commercial transactions. Commerce is not enhanced if buyers and sellers must always treat each other as adversaries, auditing every transaction as it occurs to be sure the other party is not cheating. If the jury finds that Obermeyer had been misled by an unscrupulous supplier on which it had relied in good faith, we do not think that the world of commerce will suffer from a verdict in favor of Obermeyer.

**III.    CONCLUSION**

We **REVERSE** the district court's grant of summary judgment to CSI and **REMAND** for further proceedings. We **GRANT** the unopposed motion to seal Volume 4 of appellant's appendix, which contains four pages. We also **GRANT** counsel's motion to withdraw.

---

[1] Obermeyer suggests that we need not address the negligent-assent doctrine because it is inapplicable to UCC transactions under Texas law. But much of Texas common law applies to commercial transactions "[u]nless displaced by the particular provisions of [the UCC]." Tex. Bus. & Com. Code § 1.103(b). And Obermeyer does not contest the applicability of the should-have-known test in *Preston Farm*, which, in the present context, would appear to assist CSI at least as much as the negligent-assent doctrine.

17