FILED
United States Court of Appeals
Tenth Circuit

August 28, 2017

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

———————————————————

LARITA A. BARNES,

     Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

     Defendant - Appellee.

No. 16-5166
(D.C. No. 4:12-CV-00282-JED-PJC)
(N.D. Okla.)

———————————————————

**ORDER AND JUDGMENT**[*]

———————————————————

Before **LUCERO**, **McKAY**, and **HARTZ**, Circuit Judges.

———————————————————

     Brandon McFadden was a disgrace to law enforcement. He joined other corrupt officers in fabricating evidence, stealing drugs and money from suspects, and selling drugs. Plaintiff Larita Barnes is one of his victims. Perjured testimony by McFadden and others convicted her of selling drugs. She was imprisoned until the officers' corruption was revealed. Because McFadden was a special agent of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Ms. Barnes sued the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, for various negligent and intentional torts. The district court granted the government's

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

motion for summary judgment and she now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

We affirm the dismissal of Ms. Barnes's claims of negligent training and supervision of McFadden because she did not raise them in the administrative claim required by the FTCA. But we reverse the dismissal of her claims of intentional misconduct by McFadden. As we understand Oklahoma respondeat superior law, McFadden's torts against Ms. Barnes may have been within the scope of his employment. A factfinder could reasonably decide that his perjury and other misconduct constituted an abuse of power lawfully vested in him rather than an "unlawful usurpation of power the officer did not rightfully possess," *DeCorte v. Robinson*, 969 P.2d 358, 362 (Okla. 1998), and that his motives included serving a government purpose.

## I. BACKGROUND

Brandon McFadden was an ATF special agent assigned to the Tulsa, Oklahoma field office. He worked as a liaison with the local-gang unit within the Special Investigations Division of the Tulsa Police Department (TPD). His role was to help conduct investigations, prepare cases for prosecution, and coordinate with local law-enforcement agencies. His work included assisting TPD officers to establish probable cause for search warrants through confidential informants, surveillance, and controlled drug buys. And he conferred with prosecutors in preparation of trial testimony.

McFadden often worked out of the TPD gang unit's office. In 2006 he joined a criminal conspiracy with several gang-unit officers. In 2007 and 2008 the officers stole drugs and cash they found during searches of suspected drug dealers and their homes.

2

They profited from the stolen drugs by selling them to local dealers. On at least one occasion, the officers planted evidence in a man's home, executed a search warrant on the home, and then pressured the man to participate in their drug trafficking.

Of particular importance to this case are the officers' dealings with Ryan Logsdon. In January 2007 McFadden, TPD officer Jeff Henderson, and another TPD officer executed a search warrant on the home of Logsdon, a suspected drug dealer. The officers handcuffed and questioned Logsdon in his living room in the presence of his girlfriend and three-year-old son. Henderson threatened to send Logsdon to jail and to place his son in custody if he refused to cooperate. In response, Logsdon led the officers to $13,000 cash and about two pounds of methamphetamine. Henderson and McFadden each pocketed $1,500 and retained a half pound of the methamphetamine, which they later sold back to Logsdon for $7,000. The remainder of the cash and drugs was turned over to the police department, and Logsdon's car was processed for forfeiture. From then on, Logsdon continued to deal methamphetamine while serving as a confidential informant for the officers. He occasionally met with McFadden and Henderson, paying them a total of $250,000 to $300,000 for methamphetamine over the course of the conspiracy.

In May 2007, Logsdon informed McFadden that he had bought methamphetamine from Ms. Barnes on two occasions. McFadden and Henderson began making preparations for a controlled buy between Logsdon and Ms. Barnes. McFadden followed ATF procedures to obtain $3,000 from Bureau funds and gave the money to Henderson for the purchase. But the buy never occurred. A few days later, Logsdon told the officers

3

that Ms. Barnes had "advised him not to come around anymore and that she did not want to deal with him." *Id.* at 143. According to Logsdon, Ms. Barnes had learned that Logsdon's car had been forfeited by the police and became suspicious that he was a police informant. Henderson never returned the $3,000.

Shortly thereafter, McFadden discovered that Henderson had written a report stating that the controlled buy with Ms. Barnes had occurred; and when charges were filed against Ms. Barnes, he learned that he was included in the report. Henderson urged McFadden to "[s]tick to what's on the report" because "[e]verybody hates the Barneses anyway" and "[n]o one's going to ask any questions." *Id.* at 145. Although McFadden knew the report was false, he agreed to cooperate, "believ[ing] what people had said about the Barneses all this time." *Id.*

On August 10, 2007, Ms. Barnes and her father were indicted. As was common practice, McFadden, Henderson, and Logsdon met several times to prepare for the jury trial by getting the details of their stories straight. A few days before trial, they also met with the prosecutor at the U.S. Attorney's office. McFadden served as the case agent for the trial, during which he, Henderson, and Logsdon falsely testified that Ms. Barnes and her father had sold Logsdon 87 grams of methamphetamine. On April 23, 2008, Ms. Barnes and her father were each found guilty on two charges. She was sentenced to 120 months' imprisonment; he to 66 months.

The conspiracy soon began to unravel. In 2009 federal authorities opened an investigation of TPD corruption and learned that Ms. Barnes's conviction was based on perjured testimony. Upon the government's motion, Ms. Barnes's felony convictions

4

were overturned and she was released on July 2, 2009. McFadden was indicted on several charges and pleaded guilty to conspiracy to distribute methamphetamine. At his plea colloquy he confessed:

> I used the position as a special agent with ATF to further the drug conspiracy and abused my position as a special agent. During this time, myself and Henderson seized drugs and money which were kept for our own personal benefit, falsified investigative reports, and failed to document events, and obstruct justice through falsely [sic] testimony under oath and persuading other individuals to do the same.

Aplt. App. at 73. And he later asserted in an affidavit:

> 10. The reason I did this was to help the United States of America, as an acting agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives, Jeff Henderson and the City of Tulsa to successfully prosecute the Barnes so they would subsequently be convicted of a criminal offense and therefore be imprisoned.
>
> 11. I did not do these acts for personal gain and I did not receive any personal gain or benefit from these acts. . . .

*Id.* at 178.

Ms. Barnes filed this suit in the United States District Court for the Northern District of Oklahoma. The district court granted the government's motion for summary judgment and Ms. Barnes appeals.

## II.   DISCUSSION

The FTCA provides a limited waiver of the federal government's sovereign immunity, allowing civil claims against the United States for "the negligent or wrongful act or omission" of a federal employee "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Under the FTCA the United States is liable on tort claims "under circumstances where the United States, if a private person, would be

5

liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.*; *cf. id.* § 2674 ("The United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances").

Ms. Barnes asserts claims under the FTCA for negligent supervision and training, false arrest, wrongful imprisonment, abuse of process, malicious prosecution, and intentional infliction of emotional distress. She alleges that McFadden falsely testified at her trial and instructed another person to do the same, resulting in her illegal arrest, prosecution, and imprisonment. She also alleges that the ATF negligently "failed to properly train, supervise, and oversee McFadden." Compl. at 5 ¶ 23, Barnes v. United States, No. 4:12-cv-00282 (N.D. Okla. May 15, 2012). The district court granted the government's summary-judgment motion, ruling (1) that Ms. Barnes failed to exhaust administrative remedies with respect to her claims of negligent supervision and training and (2) that McFadden was not acting within the scope of his employment.

We review de novo the grant of a motion for summary judgment. *See Obermeyer Hydro Accessories v. CSI Calendering*, 852 F.3d 1008, 1014 (10th Cir. 2017). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party." *Obermeyer*, 852 F.3d at 1014.

## A. Failure to Exhaust Administrative Remedies

A claimant under the FTCA must "first present[] the claim to the appropriate Federal agency." 28 U.S.C. § 2675(a); *see McNeil v. United States*, 508 U.S. 106, 113

6

(1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."). A claim is properly presented to an agency only if the language of the claim "serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct." *Staggs v. United States*, 425 F.3d 881, 884 (10th Cir. 2005) (internal quotation marks omitted). Because Ms. Barnes's administrative claim "included no mention of any possibility that her injuries were caused by negligent training and supervision," the district court held that her negligence claims were unexhausted. *Barnes v. United States*, 104 F.Supp.3d 1285, 1297 (N.D.Okla. 2015).

Ms. Barnes does not dispute the district court's characterization of her administrative claim. She argues only that "the FTCA notice requirements . . . should not be interpreted inflexibly" and that "a tort claim is sufficient if it provides notice of the facts and circumstances underlying a claim rather than the exact grounds upon which the plaintiff seeks to hold the government liable." Aplt. Br. at 29–30 (internal quotation marks omitted). But she fails to explain why her administrative claim lacks even a cursory mention of ATF training or supervision. The claim provides no notice of any wrongdoing by any federal officer other than McFadden. The district court did not err in dismissing Ms. Barnes's negligence claims.

### B. Scope of Employment

To determine whether the United States would be liable for the acts of a federal employee, we look to the respondeat superior law of the state where the wrongful act occurred. *See Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011) (examining

Colorado respondeat superior law to determine whether federal employee was acting within his scope of employment).

Under Oklahoma law an employer may be liable for an employee's intentional torts if the employee was "acting within the scope of the employment in furtherance of assigned duties." *Bosh v. Cherokee Cty. Bldg. Auth.*, 305 P.3d 994, 998 (Okla. 2013). "[O]ne acts within the scope of employment if [1] engaged in work assigned, or [2] if doing what is proper, necessary and usual to accomplish the work assigned, or [3] doing that which is customary within the particular trade or business." *Id.*; *accord Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1163 (Okla. 2009) (officers allegedly attacked nightclub patrons). "[A]n employer can be held liable even if the employee acts beyond the given authority" so long as the act was "incident to some service being performed for the employer." *Rodebush v. Okla. Nursing Homes, Ltd.*, 867 P.2d 1241, 1245 (Okla. 1993).

To apply the scope-of-employment analysis in the context of law enforcement, the Oklahoma Supreme Court has embraced a test formulated by the Florida Supreme Court. *See DeCorte*, 969 P.2d at 361 (claim of false arrest and assault of prisoner by officer). Under the test, "'liability exists for acts of officers that can be described as abuses of lawful power,'" but not for "'an unlawful usurpation of power the officer did not rightfully possess.'" *Id.* at 361–62 (quoting *McGhee v. Volusia Cty.*, 679 So.2d 729, 733 (Fla. 1996)). The line between abuse and usurpation is not the line between legal and illegal acts. An "'officer's misconduct, though illegal,'" may be "'accomplished through

8

a[n] abuse of power lawfully vested in the officer.'" *Id.* at 362 (quoting *McGhee*, 679 So.2d at 732).

Because the Oklahoma Supreme Court adopted the Florida Supreme Court's abuse/usurpation test, we can look to Florida cases for guidance in applying it. In the opinion quoted by *DeCorte*, the plaintiff was handcuffed and being booked when he told the deputy sheriffs that they were no longer welcome in his father's saw shop. *See McGhee*, 679 So.2d at 730. One of the deputies lunged at the plaintiff, grabbed him by the throat, and began kicking him with force. *See id.* In ruling for the plaintiff the court wrote, "The fact that [the deputy] may have intentionally abused his office does not in itself shield the sheriff from liability." *Id.* at 733. It pointed out that the deputy "clearly had the lawful authority to restrain arrestees, detain them, or even respond with force in appropriate situations," and it held that "he therefore cannot be described as a usurper." *Id.* Although the court said that the issues of bad faith and malicious purpose still had to be determined on remand, *see id.*, those issues were not relevant to scope of authority but to additional statutory requirements, *see id.* at 731 (quoting statute providing that state is not liable for torts committed "while acting outside the course and scope of [employee's] employment or committed in bad faith or with malicious purpose.").

*McGhee* provided further guidance in discussing two earlier decisions. In *Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So.2d 748, 749 (Fla. Dist. Ct. App. 1985)), an officer "allegedly had 'arrested' a minor child pretexually so that he later could sexually molest her." *McGhee*, 679 So.2d at 731. *McGhee* agreed with *Hennagan* that "'[c]onduct is within the scope of employment if it occurs substantially

9

within authorized time and space limits, and it is activated at least in part by a purpose to serve the master.'" *McGhee*, 679 So.2d at 732 (quoting *Hennagan*, 467 So.2d at 751); *see also Hennagan*, 467 So.2d at 750 ("[C]onduct may be within the scope of employment, even if it is unauthorized, if it is of the same general nature as that authorized or is incidental to the conduct authorized."). As *McGhee* explained in support of the result in *Hennagan*, "The officer's misconduct, though illegal, clearly was accomplished through an abuse of power lawfully vested in the officer, not an unlawful usurpation of power the officer did not rightfully possess." 679 So.2d at 732.

*McGhee* also endorsed a decision involving a police officer who used excessive force in committing a false arrest. *See* 679 So.2d at 732 (citing *Richardson v. City of Pompano Beach*, 511 So.2d 1121 (Fla. Dist. Ct. App. 1987), *review denied*, 519 So.2d 986 (Fla. 1988)). As *McGhee* explained, "[T]he *Richardson* court concluded that acts did not fall beyond the scope of the officer's employment merely because they were intentional." 679 So.2d at 732. Thus, "[o]nce again this showed a case of lawful power abused, not of an unlawful usurpation of authority." *Id.*

With the understanding of the abuse/usurpation dichotomy provided by *McGhee*, we conclude that summary judgment was improper. The heinous acts of McFadden that harmed Ms. Barnes were performed in the normal course of his duties—preparing for trial and testifying. The government's arguments to the contrary are not persuasive.

The government first argues that McFadden was acting outside the scope of his authority because "a federal law enforcement officer is never authorized to frame a person known to be innocent." Aplee. Br. at 28. But an officer is also not authorized to

10

use excessive force or commit sexual assault. Although McFadden, like the officers in the above cases, employed his power "contrary to the law of its use" and "use[d] it improperly and to excess," *McGhee*, 679 So.2d at 731, he did not assume a function that had not been assigned to him. *Cf. Baker v. Saint Francis Hosp.*, 126 P.3d 602, 605 (Okla. 2005) (employer may be liable where employee has authority "to do the particular thing rightfully that was subsequently done in a wrongful manner"); *Shrier v. Morrison*, 357 P.2d 196, 202 (Okla. 1960) ("[C]are must be exercised to distinguish between authority to commit a fraudulent act and authority to transact business in the course of which the fraudulent act is committed." (internal quotation marks and emphases omitted)). McFadden could not have performed his authorized duties more despicably, but he was acting within the customary scope of his duties.

The government also argues that it is not liable under general respondeat superior law because McFadden was acting for his own purposes (pursuing the conspiracy that had greatly enriched him), not the interests of the United States. The underlying proposition finds support in Oklahoma law. In *Baker*, 126 P.3d at 603–04, a hospital was sued under the theory of respondeat superior because its employee, a caregiver, intentionally struck the head of a two-month-old girl against the corner of a shelf. The court explained the relevance of the employee's motives:

> "The liability of a master for the use of force by a servant is not prevented by the fact that the servant acts in part because of a personal motive, such as revenge. The master, however, is relieved from liability . . . if the servant has no intent to act on his master's behalf[.]"

11

*Id.* at 607 (quoting Restatement (Second) of Agency § 245 cmt. f (1958)); *see also* Restatement (Third) of Agency § 7.07(2) ("An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer."). The court thus remanded for a fact-finder to determine the motive behind the caretaker's acts. It said, "[A] jury . . . must decide if [the employee's] acts were so far removed from any work-related endeavor and geared, instead, toward a personal course of conduct unrelated to her work so that it would no longer be appropriate to hold her employer responsible for her act(s)." *Baker*, 126 P.3d at 607.

In the law-enforcement context, however, the courts have generously construed the breadth of an officer's purpose, perhaps because public-policy concerns generally make it "appropriate to hold [the law-enforcement agency] responsible for [an officer's] acts." *Id.* With great power comes great responsibility, and the powers of law-enforcement officers are unique in our society. Police agencies are expected to strictly control misbehavior by their own officers. Thus, the courts of Oklahoma and Florida have said that an officer may have in mind a governmental purpose when he abuses a prisoner, *see McGhee*, 679 So.2d 729; uses excessive force in a false arrest, *see DeCorte*, 969 P.2d 358; *Richardson*, 511 So.2d 1121; assaults nightclub patrons, *see Tuffy's*, 212 P.3d 1158; or even arrests a child for the purpose of sexually abusing her, *see Hennagan*, 467 So.2d 748. McFadden declared in an affidavit that he "did not do these acts for personal gain," that he "did not receive any personal gain or benefit from these acts," and that "[t]he reason [he] did this was to help the United States of America . . . successfully

12

prosecute the Barnes." Aplt. App. at 178 ¶ 10–11.  Contrary to the government's brief,

this was sufficient evidence of an intent to serve the government.

The government contends that Ms. Barnes forfeited the argument that McFadden

intended to aid the United States because she did not raise this theory below.  We

disagree.  In her response to the government's motion to dismiss, she argued that

"[v]arious law enforcement entities and/or officers were upset at not being able to get

evidence to prosecute the Barnes so someone devised a plan to fabricate witnesses and

evidence of a drug crime to indict her and prosecute her in federal court."  Resp. to Mot.

to Dismiss at 1, Barnes v. United States, No. 4:12-cv-00282.  She further stated that:

> SA McFadden, and others, thought Larita Barnes and other members of her family were deeply involved in drug activity.  When SA McFadden went after Ms. Barnes, he did so only to further the interests of the federal government in investigating, ferreting out and helping to prosecute criminal activity.

*Id.* at 11.  And in her Rule 59(e) motion to reconsider, Ms. Barnes argued:

> It is undisputed that McFadden submitted an affidavit that none of his actions as to Ms. Barnes were for personal gain.  His acts were intended to benefit his employer, the United States of America, to successfully prosecute the Barneses.

Mot. to Recons. at 17, Barnes v. United States, No. 4:12-cv-00282 (citations omitted).

In our view, the record does not support summary judgment in favor of the

government on the respondeat superior issue.

13

## III.  CONCLUSION

We **AFFIRM** the district court's dismissal of Mr. Barnes's negligence claims.

We **REVERSE** the dismissal of the remainder of Mr. Barnes's claims and **REMAND** for

further proceedings consistent with this opinion.

Entered for the Court


Harris L Hartz
Circuit Judge